# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOEL NEWMAN, Derivatively on Behalf of Nominal Defendant SPRINKLR, INC., | ) ) ) ) Case No. 1:25-cv-3591 |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| RAGY THOMAS, MANISH SARIN, TRAC PHAM, NEERAJ AGRAWAL, EDWIN GILLIS, KEVIN HAVERTY, YVETTE KANOUFF, EILEEN SCHLOSS, and TARIM WASIM, | ) ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| SPRINKLR, INC., | ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joel Newman ("**Plaintiff**"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Sprinklr, Inc. ("**Sprinklr**" or the "**Company**"), against certain of the Company's executive officers and its Board of Directors (the "**Board**") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of an amended class action complaint filed in the action captioned *In re Sprinklr, Inc. Securities Litigation*, Case No. 1:24-cv-06132-LGS (S.D.N.Y.) (the "**Securities Class Action**"); conference call transcripts and announcements; filings with the United States

Securities and Exchange Commission (the "**SEC**"); press releases disseminated by Sprinklr; legal filings; news reports; and securities analysts' reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## NATURE OF THE ACTION

1.    This shareholder derivative action is brought on behalf of Sprinklr against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least March 29, 2023, and June 5, 2024, inclusive (the "**Relevant Period**"), and for violations of the federal securities laws arising from materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing exposed the Company to massive potential liability, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.    Founded in 2009 by Defendant Ragy Thomas ("**Thomas**"), Sprinklr is a Delaware corporation, based in New York, that claims it is "redefining the world's ability to make every customer experience extraordinary."[1] According to the Company's website, Sprinklr was intended to "unify silos, technology, and teams across large, complex companies." Specifically, the Company's software reportedly "enables customer-facing teams, from Customer Service to Marketing, to collaborate across internal silos, communicate across digital channels, and leverage AI to deliver better customer experiences at scale – all on one unified AI-based platform."[2]

3.    While the Company initially focused on social media, Sprinklr eventually expanded its artificial intelligence ("**AI**")-based platform for four product suites: (i) Sprinklr Service; (ii)

---

[1] Sprinklr, Inc., Annual Report (Form 10-K) (Mar. 21, 2025).
[2] *Id.*

Sprinklr Social; (iii) Sprinklr Marketing; and (iv) Sprinklr Insights. These products, which the Company referred to as the "**Core Suite**" could be purchased individually or collectively. The Core Suite enables companies to, among other things, manage and analyze social media content, create personalized customer interactions, optimize digital marketing campaigns, and analyze data for marketing purposes.

4.    The Company's Core Suite business accounted for the majority of the Company's revenue and allowed Sprinklr to quickly become a market leader through its unique and customizable product offerings. Due to the bespoke nature of the Core Suite business, however, Sprinklr was more expensive than its competitors. Accordingly, to sustain its position as a leader in the software-as-a-service ("**SaaS**") market, Sprinklr had to devote significant resources and manpower to achieving consistent sales and renewals of subscriptions by customers. Moreover, the Company's Core Suite was a high-priced, mature, low-growth product that relied on renewals of existing subscriptions, therefore offering limited growth prospects.

5.    To achieve desired growth, Sprinklr entered the Contact Center as a Service ("**CCaaS**") market in early 2022, with the launch of "Sprinklr Service."

6.    Throughout the Relevant Period, certain of Sprinklr's executives and members of its Board issued materially false and misleading statements assuring investors that both the Core Suite and Sprinklr Service business were performing strongly and had bright futures. While the Company's public statements focused on the purportedly rosy future of the Company, however, later disclosures would reveal that Sprinklr had diverted necessary resources and manpower from Core Suite to Sprinklr Service, damaging sales and renewals of Core Suite products.

7.    As a result of the foregoing, the Securities Class Action was filed against Sprinklr and certain of its executive officers, exposing the Company to massive class-wide liability.

3

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "**Exchange Act**") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.      In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

11.      Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), and a substantial portion of the acts and omissions alleged herein, occurred in this District.

## PARTIES

*Plaintiff*

12.      Plaintiff is, and has been at all relevant times, a shareholder of the Company.

*Nominal Defendant*

14.      Nominal Defendant Sprinklr is incorporated under the laws of the State of Delaware and its principal executive offices are located at 441 9th Avenue, 12th Floor, New York, NY 10001. The Company's common stock trades on the New York Stock Exchange ("**NYSE**") under the ticker symbol "CXM."

*Individual Defendants*

15.    Defendant Thomas served as the Company's Chief Executive Officer ("**CEO**") and as a member of the Board from the time he founded the Company in September 2009 until Defendant Pham was appointed as the Company's Co-CEO on June 5, 2024. In connection with the appointment of a new President and CEO on November 5, 2024, Defendant Thomas transitioned from Co-CEO to Advisor to the CEO, though he would continue to receive an annual base salary of $500,000 and an annual discretionary bonus with a target amount equal to 100% of his annual base salary. He continues to serve as Chairman of the Board. According to the Company's public filings, Defendant Thomas received $12,414,624 in total compensation from the Company during the fiscal year ended January 31, 2024. As of April 16, 2024, Defendant Thomas beneficially owned 688,881 shares of the Company's Class A common stock (worth approximately $7.8 million) and 59,953,366 shares of the Company's Class B common stock, collectively representing 42.9% of the Company's voting power.[3]

16.    Defendant Sarin has served as the Company's Chief Financial Officer ("**CFO**") since January 2022. According to the Company's public filings, Defendant Sarin received $4,771,317 in total compensation from the Company during the fiscal year ended January 31, 2024. As of April 16, 2024, Defendant Sarin beneficially owned 60,836 shares of the Company's Class A common stock worth approximately $690,000.

17.    Defendant Pham served as the Company's Interim Chief Operating Officer ("**COO**") from January 2024 until June 5, 2024, when he was appointed as the Company's Co-

---

[3] According to the Company's public filings, the percentage of total voting power represents voting power with respect to all shares of Sprinklr's Class A and Class B common stock, as a single class. The holders of Class A common stock are entitled to one vote per share, while holders of the Company's Class B common stock are entitled to 10 votes per share.

CEO and co-principal executive officer with Defendant Thomas. Defendant Pham served as Sprinklr's Co-CEO until the close of business on November 4, 2024, and remained with the Company in an advisory role through November 15, 2024. Defendant Pham also served as a member of the Board from June 2023 until the close of business on November 4, 2024. According to the Company's public filings, Defendant Pham received $249,986 from the Company for his service as a director during the fiscal year ended January 31, 2024. In connection with his appointment as the Company's Interim COO, Defendant Pham was granted an RSU award, valued at $900,000, which would vest in six substantially equal installments on each of February 4, March 4, April 4, May 4, June 4, and June 30, 2024. As of April 16, 2024, Defendant Pham beneficially owned 73,239 shares of the Company's Class A common stock worth approximately $830,530.

18.    Defendant Agrawal has served as a member of the Board since August 2011, and currently serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Agrawal received $253,015 in total compensation from the Company during the fiscal year ended January 31, 2024. As of April 16, 2024, Defendant Agrawal beneficially owned 12,695,695 shares of the Company's Class A common stock (worth approximately $144 million) and 6,710,304 shares of the Company's Class B common stock, collectively representing 6% of the Company's voting power. Defendant Agrawal is a General Partner of Battery Ventures, which invested in Sprinklr in 2011. As of April 16, 2024, Battery Ventures, together with its affiliates, controls 6% of the Company's total voting power.

19.    Defendant Gillis has served as a member of the Board since November 2015, and currently serves as a member of the Audit Committee. He served as chair of the Audit Committee until he resigned from that position, effective as of the close of business on March 31, 2025.

According to the Company's public filings, Defendant Gillis received $259,986 in total compensation from the Company during the fiscal year ended January 31, 2024. As of April 16, 2024, Defendant Gillis beneficially owned 56,724 shares of the Company's Class A common stock (worth approximately $643,000) and 250,000 shares of the Company's Class B common stock.

20.     Defendant Haverty has served as a member of the Board since December 2022, and currently serves as a member of the Compensation Committee. According to the Company's public filings, Defendant Haverty received $177,733 in total compensation from the Company during the fiscal year ended January 31, 2024. As of April 16, 2024, Defendant Haverty owned 33,667 shares of the Company's Class A common stock, worth approximately $381,784.

21.     Defendant Kanouff has served as a member of the Board since August 2018, and currently serves as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Kanouff received $222,486 in total compensation from the Company during the fiscal year ended January 31, 2024. As of April 16, 2024, Defendant Kanouff owned 50,134 shares of the Company's Class A common stock (worth approximately $569,000) and 300,000 shares of the Company's Class B common stock.

22.     Defendant Schloss has served as a member of the Board since January 2022, and currently serves as a member of the Compensation Committee and as Chair of the Nominating and Corporate Governance Committee. Defendant Schloss also serves as the Board's Lead Independent Director. According to the Company's public filings, Defendant Schloss received $409,121 in total compensation from the Company during the fiscal year ended January 31, 2024. As of April 16, 2024, Defendant Schloss owned 66,042 shares of the Company's Class A common stock (worth approximately $749,000) and 45,000 shares of the Company's Class B common stock.

23.    Defendant Wasim has served as a member of the Board since October 2020, and currently serves as a member of the Audit Committee and as Chair of the Compensation Committee. According to the Company's public filings, Defendant Wasim elected to waive all rights to any compensation payable to him for his services as a member of the Board. Defendant Wasim is a Partner at Hellman & Friedman LLC ("**Hellman & Friedman**"), which invested in Sprinklr in 2020, and he was appointed to the Board pursuant a contractual right held by an affiliate of Hellman & Friedman. As of April 16, 2024, entities associated with Hellman & Friedman control 44% of the Company's total voting power.

24.    Defendants Thomas, Sarin, Pham, Agrawal, Gillis, Haverty, Kanouff, Schloss, and Wasim may be collectively referred to herein as the "**Individual Defendants**."

*Relevant Non-Parties*

21.    Jan R. Hauser ("**Hauser**") was appointed to the Board on January 29, 2025, in connection with the Board's decision to increase the size of the Board from eight to 10 directors, and currently serves as Chair of the Audit Committee.

22.    Rory Read ("**Read**") was appointed to serve as the Company's President, CEO, and principal executive officer, effective as of November 5, 2024. He was also appointed to serve as a member of the Board as of November 5, 2024.

23.    Stephen M. Ward, Jr. ("**Ward**") was appointed to the Board on January 29, 2025, in connection with the Board's decision to increase the size of the Board from eight to 10 directors, and currently serves as a member of the Compensation Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28.    Because of their positions as officers and/or directors of Sprinklr, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed

Sprinklr and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

29.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of Sprinklr and its shareholders.

30.     Each director and officer of the Company owes to Sprinklr and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sprinklr, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Sprinklr, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's use of resources for its new CCaaS offering, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

34.     To discharge their duties, the officers and directors of Sprinklr were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Sprinklr were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Sprinklr's own Code of Conduct and Ethics (the "**Code of Conduct**");

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders were made with due candor in a timely and complete fashion;

(d)     Remain informed as to how Sprinklr conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Sprinklr and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sprinklr's operations would comply with all applicable laws and Sprinklr's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

35.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

36.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Sprinklr and were at all times acting within the course and scope of such agency.

37.    Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

40.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

41.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are officers and/or directors of the Company, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual

or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

43.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sprinklr and at all times acted within the course and scope of such agency.

## SPRINKLR'S CODE OF CONDUCT

44.    Sprinklr's Code of Conduct begins with a message from the Company's CEO and the Board, which states, in relevant part, as follows:

> 'Do the right thing' is the spirit by which Sprinklr operates. This Code of Conduct and Ethics (this 'Code') outlines the expectations of all Sprinklrites and anyone working on Sprinklr's behalf to help ensure that we do the right thing for each other, our customers, partners, stockholders, and the long-term success of Sprinklr.
>
> This Code also aligns with the Sprinklr Way, which reflects the core values of high performers who are kind and caring. Every action and decision is an opportunity to live in accordance with the Sprinklr Way, and this Code is a guide for how we conduct ourselves in an ethical way inside and outside of Sprinklr. Our commitment to this Code helps to ensure that we hire great people, nurture and protect our culture and reputation, build amazing products, and help our customers build brands that their customers love.

45.    The Code of Conduct applies to "employees and anyone working on Sprinklr's behalf. Every employee, officer, director, and third party acting for or on behalf of Sprinklr, such as partners, contractors, agents, and/or other third-party agents, must read, understand, and follow this Code."

46.    The Code of Conduct, however, specifies that "[i]f you are in a leadership or management position at Sprinklr, you are expected to meet" the following "additional responsibilities:"

- **Lead by Example and Empower Others:** Serve as a role model for ethical leadership and appropriate conduct and educate your teams on ethical obligations under this Code.

- **Prioritize Transparency and Accountability:** Create, maintain, and foster an environment where everyone feels comfortable speaking up, and be supportive and responsive to employees who come to you with questions and concerns.

- **Escalate Questions:** Know when and how a question or concern should be reported to Sprinklr's Culture & Talent Team, Legal Team, or the Chief Compliance Officer.

- **Report Concerns:** Report any violations of this Code or Sprinklr's Governance promptly and help ensure that no one who speaks up or participates in an investigation suffers improper retaliation.

47.    In a section titled "Compliance with Laws," the Code of Conduct states:

Our success depends upon each employee, officer, and director operating within legal guidelines and cooperating with local, national, and international authorities. Certain laws, such as those pertaining to security and data privacy, are core to our business. These laws apply to various types of information, including personal information, financial information, and other sensitive information. Depending on your role, there are other laws that may relate to your work at Sprinklr, such as laws prohibiting corruption, unfair competition, and rules and regulations governing trade controls, exports, and imports.

While we do not expect all Sprinklrites to memorize every detail of these laws, everyone is expected to be familiar with the legal and regulatory obligations that are relevant and applicable to your business units and areas of responsibility, which are outlined in this Code and in Sprinkl's Governance.

48.    In a section titled "Honest and Ethical Conduct," the Code of Conduct states:

Sprinkl's reputation depends on the honesty, fairness, and integrity brought to the job by each Sprinklrite, and the highest standards of personal integrity, sound judgment, and accountability are the foundation of this Code, Sprinklr Governance, and the Sprinklr Way. Acting with honesty, fairness, and integrity is also paramount to earning and maintaining the trust of our customers. Becoming the world's most loved enterprise software company requires that we maintain the integrity of our business operations, the safety and

security of the data that we are entrusted to process, and the relationships that we have built with our customers and partners.

\* \* \*

Maintenance of Corporate Records, Financial Integrity, and Public Reporting

Sprinklr's corporate and business records should be completed accurately and honestly. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, partners, suppliers, creditors, employees, and others with whom we do business. As a result, it is essential that Sprinklr's books, records, and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs, and expenses, as well as all transactions and changes in assets and liabilities. The integrity of Sprinklr's records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Making false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. We further require that:

• No entry is made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or that misclassifies any transaction as to accounts or accounting periods;

• Transactions are supported by appropriate documentation;

• The terms of sales and other commercial transactions are reflected accurately in the documentation for those transactions, and all such documentation be reflected accurately in our books and records;

• You comply with all Sprinklr systems of internal controls; and

• No cash or other asset is maintained for any purpose in any unrecorded or "off-the-books" fund.

Sprinklr's accounting records are also relied upon to produce reports for our management, stockholders, and creditors, as well as for governmental agencies. Sprinklr relies upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the 'SEC'), and securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosures that fairly present our financial condition and results of operations. Employees who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these

reports should strive to ensure that Sprinklr's financial disclosures are accurate and transparent and that our reports contain the information about Sprinklr that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

• No employee may take or authorize any action that would intentionally cause Sprinklr's financial records or financial disclosures to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC, or other applicable laws, rules, and regulations.

> • You must cooperate fully and promptly with Sprinklr's Legal, Finance, and Internal Audit activities, as well as our independent public accountants. You must respond to their questions with candor and provide them with complete and accurate information.
>
> • You must help ensure that Sprinklr's books and records, as well as our reports filed with the SEC, are accurate and complete. No employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosures in any of our reports accurate in all material respects. Obligations around the integrity and accuracy of Sprinklr's books and records also extend to accurate sales forecasting, as well as the need for all Sprinklrites to maintain accurate and up-to-date information in any of Sprinklr's information systems, tools, and systems of record that they manage and engage with.

49. The Company also maintains Corporate Governance Guidelines, which were reportedly "designed to give directors a flexible framework for effectively pursuing the Company's objectives for the benefit of its stockholders."

50. The Corporate Governance Guidelines describe the "Role of the Board of Directors" as follows:

> Stockholders elect directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Board service requires significant time and attention. More specifically, the Board has responsibilities

16

to review, approve, and monitor fundamental financial and business strategies and significant corporate actions, assess the Company's major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain the Company's integrity. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. The Company expects directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand honest and accurate answers. Directors must act with integrity and demonstrate a commitment to the Company, the Company's values, business, and long-term stockholder value.

51.     As set forth by the Corporate Governance Guidelines, a director's responsibilities include, among others:

- discharging his or her duties "in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders; and

- complying with applicable laws and regulations, and with all policies and guidelines of the Company, including the Code of Conduct.

## SPRINKLR'S AUDIT COMMITTEE CHARTER

52.     According to the Audit Committee Charter, the purpose of the Audit Committee of the Board is to "assist the Board in fulfilling its oversight responsibilities[,]" particularly with respect to:

- the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the '*Auditors*');

- the performance of the Company's internal audit function; and

17

- the Company's compliance with legal and regulatory compliance, including risk assessment and compliance with ethical standards adopted by the Company.

The Committee will also prepare the report required by the rules of the Securities and Exchange Commission ('***SEC***') to be included in the Company's annual proxy statement.

53.    Regarding "***Financial Review and Disclosure***[,]" the Audit Committee Charter indicates

that that Audit Committee's responsibilities include, among other things:

**8. Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements, and the Company's 'Management's Discussion and Analysis of Financial Condition and Results of Operations' and 'Risk Factors,' as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

**9. Earnings Announcements.** The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information). To the extent practicable, the Committee will review in advance the script for any earnings or finance-related conference calls to be held for the benefit of the public, analysts and ratings agencies.

54.    In a section titled "***Internal Control and Procedures***[,]" the Audit Committee

Charter indicates that the Audit Committee is responsible for, *inter alia*:

**15. Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these

18

exposures and to identify future risks. The Committee will review and discuss with management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

\* \* \*

**18. Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting, including responsibilities, budget and staff of the internal audit function, and to review the appointment or replacement of the senior internal audit executive or manager, and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

\* \* \*

**22. Ethical Compliance.** The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Conduct and Ethics ('***Code***'). The Committee will consider any request by directors or executive officers of the Company for a waiver from the Code. Any approved waivers shall be promptly disclosed as required by applicable law and stock exchange listing requirements.

55.    The Audit Committee Charter also specifies that the Audit Committee is responsible for "oversee[ing] the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement" and "review[ing] with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements…"

56.    Finally, the Audit Committee Charter requires the Chairperson of the Audit Committee to "report to the Board on the Committee's activities, discussions and actions."

## SUBSTANTIVE ALLEGATIONS

57.     Sprinklr was founded in 2009 by Defendant Thomas who, after building an email marketing platform, reportedly saw the potential to build something focused on the fledgling social media space. Accordingly, when the Company was first founded, Sprinklr focused its business primarily on social media management, including engagement, publishing, and advertising.

58.     According to Sprinklr, the Company enables large businesses to more efficiently navigate all customer-facing functions, and its offerings are geared towards large customers. According to the prospectus filed in connection with the Company's June 2021 initial public offering ("**IPO**"), of Sprinklr's 1,021 customers, more than 50 were members of the Fortune 100. Moreover, the IPO prospectus noted that 69 of the Company's customers were responsible for nearly half of its subscription revenue.

59.     Prior to entering the CCaaS market, Sprinklr sold four product lines that it called "Core Suite," which could be purchased individually or collectively: (i) Sprinklr Insights; (ii) Sprinklr Service; (iii) Sprinklr Marketing; and (iv) Sprinklr Social.

60.     Prior to the Relevant Period, the Core Suite focused on Sprinklr Social, Sprinklr Marketing, and Sprinklr Insights – the key drivers of the Company's revenue and results. Specifically, the Core Suite was the main source of the Company's primary revenue stream, which it referred to as "Subscription Revenue." For the 2021, 2022, and 2023 fiscal years, Subscription Revenue represented 88%, 87%, and 89% of the Company's overall revenue, respectively, and, for the 2023 fiscal year, the Core Suite was responsible for approximately 81% of the Company's Subscription Revenue.

61.     Sprinklr's Core Suite offerings are sold as SaaS, a licensing model in which access to software is provided in a subscription basis. The software is located on external servers and

users can access the program via the Internet rather than having to install the software on their own computers. Sprinklr, like other SaaS providers, charges a fee for accessing its products, generally on a per-user level.

62. SaaS products are generally easier to implement, update, and debug compared to traditional software licenses because they do not require hardware setup and installation and are easily accessible through the Internet. Because the Core Suite was highly customizable, however, it prevented the Company from obtaining the type of growth available with SaaS products deployed without customization.

63. In an attempt to achieve growth no longer available in its Core Suite, Sprinklr decided to launch a CCaaS solution, transforming its fledgling "Modern Care" offering into a full CCaaS product suite that it called Sprinklr Service.

64. The Individual Defendants, however, caused Sprinklr to misrepresent several critical aspects of its transition towards the CCaaS-based Sprinklr Service, including the cannibalization of resources previously deployed to the Company's Core Suite business for use by Sprinklr Service.

65. These misrepresentations hid the damaging diversion of resources from the Core Suite to Sprinklr Service, known to the Individual Defendants from planning through execution, inflating investor confidence, and ultimately damaging the Company when the truth unraveled, triggering massive financial losses and a stock plunge.

***The Individual Defendants' Specific False and Misleading Statements***

66. On March 29, 2023, Sprinklr announced fourth quarter and full year financial results for the 2023 fiscal year ending January 31, 2023. During the earnings call held that day, Defendant Thomas talked about both Sprinklr's CCaaS and Core Suite businesses. Specifically,

Defendant Thomas misleadingly reassured investors about the promise of Sprinklr Service and the Company's continued focus on the Core Suite, stating:

> In closing, I'd like for you to have three clear takeaways. Number one, we're going to be a disruptive player in CCaaS. That's a pretty 30, 40-year-old industry. We are a digital-native company, who has created a modern omni-channel approach to integrating 30-plus digital channels that now includes voice. And we're challenging some of the well-known legacy players with an entirely different approach omnichannel and AI base for customer service. ***Number two, we will continue to innovate and win in social. It's where we started as a company, and that foundation has enabled us to build disruptive new opportunities like we are doing in CCaaS.*** And lastly, number three, we are well positioned to begin mainstreaming our solutions and AI for customer-facing functions. We have a five-year head-start, an advantage in building proprietary AI that's integrated into all products across our entire platform, a platform that's built on a highly open, scalable and flexible architecture.

67.    In response to questions from analysts, Defendant Thomas expanded on Sprinklr Service, painting a misleading picture of its ability to garner immediate results, the Company's preparation to enter the CCaaS market, and the risks posed by Sprinklr's diversion of resources:

> **Q – Tyler Radke:** Yes. Thank you. And hi, Ragy. I wanted to ask you about just contact center, you talked about some interesting milestones on the seat count and the recognition in some of the Gartner Magic Quadrant, which is just great to see. Wondering if you could just kind of contextualize that a bit more just in terms of how big of a mix of that in your business it is today and what you're seeing in the pipeline. And is that an area that you're really leaning into in terms of hiring specialists just given that's a bit of a different market than where traditionally Sprinklr's focused? Thank you.
>
> **A – Ragy Thomas:** Yes. So I can confirm that it is a big focus for the company. ***In fact, internally, we say this is the year of our contact center business. I can confirm that this is something that was very intentional and we have been doing steadily for the last several quarters, I would say, for the last probably even 18 months. So we have been hiring people from traditional contact center companies. We have -- we're building out and have built out a team of dedicated specialists. So it's very important to have that domain knowledge and vocabulary in addition to the technology. So we have staffed everything from the product organization to the sales organization and support organization people who have been***

> ***doing it, in some cases, for like 20-25 years, who are also equally elated to see a very modern approach to this whole space.***

68.     Following the earnings call, analysts touted the "strong traction" that Sprinklr was seeing with its CCaaS business and the "solid retention trends" the Company was experiencing in its SaaS business. William Blair, for example, noted that Sprinklr was "Outperforming Expectations on All Fronts[.]" BTIG raised its price target for the Company, indicating its belief that "the near-term opportunities in Service and around the growing CCaaS modernization story in the market, coupled with deep AI-powered Social and Marketing tools, should continue to drive the upside in the story."

69.     On June 5, 2023, Sprinklr released financial results for the first quarter of its 2024 fiscal year. In any earnings call with investors that day, Defendant Thomas commented on the macro environment and the progress of Sprinklr Service's CCaaS business, stating:

> So, despite the macro environment, ***we are very pleased with how we're managing, what's in our control with our go-to-market strategy, productivity and execution. Specifically, we're excited about the progress we're making to make it easier to sell, which has been a top priority for the company.*** This past quarter, we made several key hires in the service overlay team to add expertise and depth to our CCaaS offering go-to-market, and we continue to verticalize to enable quicker time-to-value and faster deployments. ***We are now up and running for CCaaS, with a couple of more key industries, including financial services and airlines.***
>
> * * *
>
> ***I'd love to provide a brief update on Sprinklr Service and our continued momentum as a disruptor in the CCaaS space. Our vision is to help customers transform the contact center from a voice-focused cost center to a more efficient and effective AI-powered omnichannel revenue center by unifying it with marketing and sales. IT buyers find Sprinklr to be a great fit for their needs, as they consolidate point solutions in the contact center stack to a platform that's built on a single code base with a very extendable architecture.***

70.     In response to a question about customers renewing their business with Sprinklr,

instead of admitting the risks to customers' renewing with Sprinklr, Defendant Thomas again omitted material facts, thereby painting a misleadingly optimistic portrait of the Company's Core Suite business:

> **Q – Tyler Radke:** Yes. Thank you. Good evening. I wanted to just ask you about how you're seeing some of the large renewals shape up. I think you've talked about some large renewals expected here in Q2. Some of the other larger front office players have talked about some renewal pressure. We've heard anecdotes of shelf ware and seats that have gone undeployed. How are you expecting your renewal rates to trend? And if you could just remind us on the composition of your revenue base that's seats-based versus usage or interactions-based? Thank you.
>
> **A – Ragy Thomas:** Okay. So, there are two questions there. ***The first one is what are we seeing in our larger deals in terms of renewal. I'll tell you, once you buy into the Sprinklr approach, we keep growing.*** And two-story now, we have customers, who call us first before they go put out an RFP or open it up to a point solution, hey, do you guys do it, because they've bought into, they've tuned the AI model, they've set up the governance, they've got the analytics. I'll give you an example of a very, very large, I'd say top five, probably top three tech company that expanded their marketing services with us. And the idea was there was an agency breach that happened and issue that resulted in ad spend that was not governed and approved. So, they just paused spending till everybody got on Sprinklr, so that they can be compliant, right? And so they can have governance and visibility and they can have a global editorial calendar. So, I can confirm to you and you know we had one customer that paid us over $15 million, and if you count the number of customers that are paying over $10 million, that's going up as well.

71.     On July 12, 2023, the Company held its 2023 Investor Day conference. During the conference, Defendant Sarin spoke about the state of Sprinklr's CCaaS and Core Suite businesses, stating as follows:

> Second takeaway; ***all product suites are growing at a very healthy rate. I bring this out because many a times investors are of the – have some concerns that it is the case that one product suite is making up for declining growth or tepid growth on another product suite and that isn't the case here.***

72.     Notably, Defendant Sarin also announced that the Company was setting guidance

for $1 billion in subscription revenue as not just a goal but the "floor" for fiscal year 2027:

> ***What we are comfortable doing is at this point setting $1 billion in subscription revenue as floor for FY 2027. Now, that would compute to roughly an approximate 16% CAGR between now and then. And just so that we are clear, FY 2027 is really calendar year 2026. That ends in January 2027. So it really is three years from now.*** So what is baked into these numbers?

> What we have taken into account is the current environment persists. I have no way of projecting is there going to be a recession? Is there not going to be a recession? There is any number of pundits you find on CNBC talking about what's going to happen next? I didn't feel it was the right forum for me to make one of those statements. So we feel, given what we know right now, if the current environment persists, ***we are comfortable setting $1 billion in subscription revenue as floor.*** Said differently, should the environment improve, should sales cycles become shorter; all of that would be upside to these numbers.

> Now you'll notice I am not specifically talking about professional services revenue here. And I think that goes back to the earlier point that I made, that we fully expect that professional services mix to morph quite considerably over the next few years. We believe it's going to become a lot more targeted, a lot of it driven by CCaaS delivery and managed services, but the quantum of it may not be very much different than where we are today. So I think if you look at the broader picture, it seems to be a much smaller proportion of overall revenues than where we are today. And it just felt like in terms of setting the stage, subscription revenue is what we need to be measured against and ***we are comfortable putting down $1 billion as the floor for subscriptions***[.]

73.     Defendant Thomas also repeated Sprinklr's commitment to constant

communication with customers, making clear to investors that they check in with customers

"every month" on whether they are happy with Sprinklr's product:

> But you learn that we obsess about customers. I did 300 meetings last year, and every customer meet, I give them my cell phone number, and I say, call me if you're ever, ever upset. If you think we bullshitted you, call me. If you want to buy, our team will take care of it. My CTO flies over. We have AKA one of my engineers should be here. We've own him with a one way ticket to one of our

customers early on and we told him, don't come back until the customer is happy. If you know other enterprise software companies that do that, buy their stock, right, but they learn it.

* * *

And for us, customer obsession starts when, after the sale, right. Checking in, making sure they get value. They're consuming the software. And we have a price. We don't do NPS. The reason we don't do NPS is we don't want to know whether you would recommend this. We ask you every customer, every quarter, every month, depending on the size of the customer, we ask them, how happy are you at Sprinklr, that's it.

If you give us a 10. It means you're so happy that you're telling your kids about Sprinklr and they go mommy I don't know why you bother me with this stuff. And zero means you red us and we didn't know it. And if you don't give us a 10, we ask you, what are the three things we can fix? Three things we get to prioritize, go to a product development process every week regionally it gets escalated. Early days at Sprinklr, I would say there's only one meeting you cannot miss in Sprinklr, it's called CDAP. Well, you could miss if you're attending your funeral you can miss the meeting, otherwise you're on. If your customer is unhappy, you're on. I'm not, I don't get upset at most things, most of you know that, I only curse out of excitement. But if a customer is unhappy and you're not jumping up and down to fix it, I will get upset. That's baked into Sprinklr.

44.     Defendants' statements had their intended effect. Analysts came away from the conference with increased confidence in the Company, with an analyst from Cantor Fitzgerald noting:

> [I]n a worst-case scenario, management expects subscription revenue of $1bn and FCF of $200m in FY27E, targets that we believe the company is positioned to meaningfully exceed . . . the market is underappreciating Sprinklr's contact-center-as-a-service (CCaaS) offering, which, when coupled with other product suites, is an extremely compelling product that we believe will be responsible for a majority of growth over the coming years[.]

45.     Moreover, the day before Sprinklr's Investment Day conference, the Company's stock price closed at $14.30, and the day after Sprinklr's Investment Day Conference, the Company's stock price rose to a high of $15.50 – an increase of over 8%.

46.     On September 6, 2023, Sprinklr announced financial results for the second quarter of its 2024 fiscal year and held an earnings call for investors. In response to an analyst question about renewals, Defendant Sarin stated as follows:

> **Q – Pinjalim Bora:** … You talked about some early -- or some renewals as well and some large deals. But is there -- I want to ask you if there's a meaningful expansion in the contract durations, which is kind of inflating the year-over-year growth rate, any way to think about that?
>
> **A – Manish Sarin:** Yes. And I -- I think, we did call out the fact that, look, our growth in RPO is because several large customers renew on a multi-year basis. But those are the ones you'd remember from even a few years ago, we had them do multi-year billings. So that hasn't happened this time, where we are sticking to annual billings. When I called out on the billing side that there were select customers that renewed early, that was only to make sure that, as you think about your Q3 billings, you do take that into account. *But I think macro, if you just step back, we're seeing strength in renewal activity, as shown in the multi-year RPO renewals, RPO numbers, as well as our sense around overall billings for the year.*

47.     When responding to an analyst question about renewal rates for Sprinklr's Core Suites, Defendants Thomas and Sarin both claimed that business was steady:

> **Q – Tyler Radke:** Yes. Hi. Thanks for taking the question. Wanted to just hear how you're seeing things trend so far in Q3. Sounded like some really good execution in the quarter on the renewals and the large eight-figure transaction. But have things been consistent in Q3 versus Q2? What are you just expecting in terms of the large deal potential in the second half? Thank you.
>
> **A – Ragy Thomas:** Well, I'll take the first part of it, and maybe Manish can talk about the next quarter. Look, the macroenvironment is just about as uncertain as it was, and it has been. So we -- *we're not seeing any different behavior this quarter or last quarter than we saw before.* Budgets are tight, there's more CFO scrutiny and all the good things that come with people being not very sure where the market's going, right, and interest rates are going to be. *But I think what you're seeing is, like a consistent trickling impact of our better execution and focus on go-to-market.*
>
> **A – Manish Sarin:** Yes. And just to make sure I understand, was your question, Tyler, are we seeing anything different in the month

or so of Q3 that we've been in compared to Q2? Was that what you were trying to ask?

**Q – Tyler Radke:** Yes. Sorry. So I guess, I'll rephrase the question slightly to make it more specific, and apologies for the background noise. But really, the question was just, you saw some really good, large deal activity in Q2. I know there's been a lot of noise around RPO and current RPO because of the multi-year renewal cycle. So I'm just curious if there's any things to call out in terms of RPO, volatility? And just how your overall large deals, you're expecting those to land in Q3, Q4, just anything that would be noteworthy to call out as we're building our models? Thank you.

**A – Manish Sarin:** Hey, yes, thank you for that clarification, Tyler. But there's nothing that I would call out at this stage. We -- as I look at the quantum of business that we are booking, it sort of seems in-line with what we would expect. It's – like any enterprise software company, we're pretty back-end loaded, so I wouldn't make any broad assumptions around how Q3 and Q4 would land. But ***there is nothing that we are seeing today that would give us any cause for concern. It's sort of along the lines of what we would expect. So -- so steady is what I would say.***

48.    On September 7, 2023, Defendant Sarin attended the Citi Global Technology

Conference. When speaking with an analyst about Sprinklr selling the Core Suite and Sprinklr

Service, Defendant Sarin stated:

**Q – Tyler Radke:** So, talking about the go-to-market, there are a couple of areas I wanted to hit on. First, just as you think about your success in CCaaS, I mean, certain CCaaS and social, there is some synergies, right? Because to be able to serve customers, you got to ingest all this omni-channel information. But in terms of the buyer organization, especially in the enterprise where you sit, it often can be different departments and different organizations. So, I guess what have you had to do on the go-to-market side to really have that success in CCaaS.

**A – Manish Sarin:** Yeah, ***I think that's a fantastic question because we were acutely aware that the buyer for our traditional set of products, our core products, was somebody in the marketing team. And as we are outselling CCaaS, in some companies, social care is still with marketing. So that's an easier sell. When you're obviously trying to do a full stack replacement, that is sitting with the CIU as an example. So, what we have done is two things. One is there is a specialist overlay team today, so that we started hiring,***

28

*I'd say, about 9, 12 months ago. And they've come from your big CCaaS vendors. They sort of know the lingo. They know how to go about selling the product. They know where the bodies are buried. So, they've been a tremendous addition to the sales team. And so, we have aligned them by, what we call, sort of divisional leaders. So, in the US, there'll be, several of them, same in EMEA same in APJ. And the idea there is they worked hand in glove with the individual reps in the territories to unearth new CCaaS opportunities. So, that's something that's working really well.*

49.     When questioned about the tradeoff of growth versus margins, Defendant Sarin misleadingly denied the premise of the question and omitted the known tradeoff the Company was making with its shift towards Sprinklr Service at the expense of the Core Suite business, stating:

> **Q – Tyler Radke:** Great. So, shifting a little bit to the cost side, you mentioned, Manish, and when you joined you – relative to when you joined, margins are considerably higher. Maybe just frame for us what were some of the efficiencies that you were able to unlock at the company? I know you're never done finding efficiencies as a CFO, but are we kind of mostly through those initial things you've identified and how should we just think about the tradeoff of growth versus margins as we go forward?
>
> **A – Manish Sarin:** Yeah, I think that's a fantastic question, because one of the things we've been very clear in saying is maybe in the past, investments in the company were not entirely thought through the lens of what is unit economics or is productivity per rep improving. And I think we're now just applying a little bit more careful analysis, if you will, before we make any more investments, right? ***So, I don't think one should view it in the lens of is this a cost versus growth trade off because we believe we have enough investments in place that should allow us to grow at the rate that we are growing.*** So, where are we getting all these efficiencies from? Even things like when I said technology, solution brokers for CCaaS, that obviously means I don't need that many direct reps selling CCaaS because I have partners doing it for me, right?

50.     Again, analysts credited management's statements, with several analysts maintaining their Outperform rating for the Company.

***The Truth Begins to Emerge***

51.     On December 6, 2023, the Company held an earnings call to discuss financial results for the third quarter of its 2024 fiscal year. During that call, Defendant Thomas began to acknowledge the impact of Sprinklr's diversion of resources towards Sprinklr Service at the expense of Core Suite, as follows:

> *The investments we've been making over the last 18 months are enabling us to Mainstream our product suites into large replacement markets starting with establishing ourselves as a disruptor in CCaaS. As we've diversified the business and focused on scaling our CCaaS business, I would like to acknowledge that they've made slower progress on some of our other go-to-market initiatives focused on our core product suites.*

52.     Defendant Sarin reiterated what Defendant Thomas told investors, stating:

> *Our primary strategic focus in FY '24 has been to rapidly scale our Sprinklr service product suite. We are very pleased with the results, having made significant demonstrable progress with Sprinklr service, gaining market share and customer momentum in the CCaaS market.*
>
> As Ragy mentioned, *our focus on succeeding in our CCaaS business slowed progress with some of our other go-to-market initiatives in our core product suits, much more than we had anticipated.*

53.     When discussing the issue with analysts, Defendants Thomas and Sarin expanded on the decision to divert resources and manpower from the Core Suite to Sprinklr Service (or "overrotate," as the Individual Defendants described it), and made clear that Sprinklr's reduction in growth, including in reduced sales and renewals for its Core Suite products, was caused not by any macro conditions outside of the Company's control, but was directly a result of the Company's shift towards Sprinklr Service, stating:

> **Q – Michael Vidovic:** Hi, this is Michael Vidovic on for Michael Turits and thanks for taking my question. On the headwinds you talked about seeing this quarter with the over-rotation the down sell pressure. I guess, were you not seeing those same dynamics in Q2 and Q3 and like a similar frequency? Or is that still relatively new for this quarter? Thanks.

**A – Ragy Thomas:** It's kind of consistent, right? But because as Manish said, we have a much bigger base coming up in Q4. So we're not seeing the macro environment get better or get worse. And so I wouldn't characterize it something changed in Q4.

\* \* \*

**A – Ragy Thomas:** But I would, again, to reconcile the two, right, the macro, we don't think is what's changing. ***It's really our over-rotation that's causing the change that, where Manish has articulated.***

54.     Acknowledging that the adverse impact of management's planned "over-rotation" lowered growth expectations for the Company's 2025 fiscal year, Defendant Sarin told investors:

At this time, based on what I just outlined, coupled with an unforgiving macro environment, we expect a sequential quarterly increase of 2.5% for each quarter of FY '25. ***This equates to approximately a 10% total revenue growth for the full year, which we believe is the appropriate starting point for FY '25.***

55.     Despite these admissions, Defendants continued to mislead investors, claiming that the issues that led to reduced growth in the Core Suite business had been resolved. Specifically, in response to questions from analysts, Defendant Thomas elaborated on the impact of the Company's strategy of focusing on Sprinklr Service at the expense of the Core Suite, telling investors that the problems had been fixed:

**Q – Arjun Bhatia:** Okay. Got it. And then, just as we look to the other side of this, when you think about the go-to market revamp, what are some of the steps that you need to take to, you know, I guess, refocus on the broader suite? Is there incremental hiring that needs to happen? Or is it more a matter of, you know, internal resource allocation enablement, et cetera?

**A – Ragy Thomas:** ***It's more of an internal resource allocation. In hindsight, I think the most obvious explanation for this is the fact that we, and I don't know whether we would have, knowing everything we know, done it differently. We kind of overrotated a little bit more on the CCaaS side. And so we took our field and we incented them strongly to go sell CCaaS.*** And essentially there's a lot of people who jumped in and really are happy and we're thrilled with the results.

And there are some that jumped but didn't quite -- jump -- didn't quiet [sic], make it on the other side. ***And the the [sic] fix is quite obvious to all of us. You've got to take the field folks in sales and support and service that came from the social suite background or the marketing suite background or the research inside suite background, and we got to let them go back and focus on it.***

So what we are doing now, as we think and plan for the next year is we are adjusting quotas and we are just bifurcating or trifurcating the field to just -- so you can fix the overrotation. We did, and we're pretty hopeful that in one or two quarters, we'll begin to see some data that would allow us to just update you further.

56.    In a further attempt to downplay the damage to the Company, Defendant Sarin falsely claimed that the $1 billion subscription "floor" promised for the fiscal year ending January 31, 2027, remained intact:

> **Q – Noah Herman:** Got it. No. Thanks so much for that answer. And then maybe just focusing a little bit more on the model as we sort of contemplate the preliminary 2025 guidance. You know, how does that, if anything, does that change at all the long-term model that you had outlined during your Analyst Day? How should we really think about that going forward?
>
> **A – Manish Sarin:** Yeah. ***It does not change our FY '27 long-term plan.*** And again, just to be clear, this is not our guide for '25. I will do that in our March earnings call. Just given the some of the renewal pressures we are seeing here in Q3. And as I said Q4, we expect it to be, you know, quite intense. Given the visibility that we have, and we just wanted to be clear that we laid out what we are seeing right now, it might change substantially when we talk in March, and we talk about the full year guide. ***But sitting where we sit today, we don't feel any difference about FY '27 than we did six months ago.***

57.    Analysts credited the statements made by Defendants Thomas and Sarin, believing that the "overrotation" would not have lasting effects or impact Fiscal Year 2027 guidance. For example, while expressing disappointment, analysts from J.P. Morgan noted that they saw the "pressure on renewals" as "more of an 'air-pocket' created by a perfect storm of events[.]"

58.    On March 27, 2024, Sprinklr issued a press release announcing results for the fourth quarter and full 2024 fiscal year, which included the following guidance for the fiscal year ending

January 31, 2025:

- Subscription revenue between $740.5 million and $741.5 million.
- Total revenue between $804.5 million and $805.5 million.
- Non-GAAP operating income between $104 million and $105 million.
- Non-GAAP net income per share between $0.38 and $0.39, assuming 291 million diluted weighted-average shares outstanding.

59.     That same day, the Company held an earning call to discuss its financial results. In response to an analyst's question about renewals, Defendant Thomas stated as follows:

> **Q – Jackson Adler:** Okay. Alright. Gotcha. And then on the renewals pressure, so expecting it kind of to persist here in the first half and then maybe start to go away. I'm just curious, like, how do we know that the pressure will end. Is there something -- is there some cohort or is there something specific about the renewals that are going to be happening over the next couple of quarters that you can point to and say like, they are different from what the renewals will look like after we get past this first half.

> **A – Ragy Thomas:** Okay. So I think, first off, I got to tell you, we put a lot of energy behind understanding what is going on. ***And what I can confirm, as we've done in the past, is we think the majority of it is self-inflicted. And what we're finding that is that the best execution of our team versus the best execution of any competitor in our core markets and the CCaaS frankly we win. So what we're finding is -- and I say it's self-inflicted because weak execution on our side, meeting strong execution of the competitor is when we are losing. And so it gives us a lot of confidence that these are fixable things and it's a part of this big set of initiatives that we have outlined. And like we said, it's going to take a few quarters, but right now we're pretty optimistic that we should see a retention go back to our historic norms once our execution and what we can control is addressed.***

60.     Defendants' attempts to ease concerns about Sprinklr's shift in focus and resources towards Sprinklr Service succeeded. The Company's stock price jumped from $12.89 on March 27, 2024, to a high of $14.31 on March 28, 2024.

***The Full Truth is Revealed***

61.     On June 5, 2024, the Company issued a press release disclosing financial results for

the first quarter of its 2025 fiscal year. The press release included the following guidance for the

full fiscal year ending January 31, 2025, admitting that the projections provided just two months

earlier, on March 27, 2025, could not be met:

- Subscription revenue between $714 million and $716 million.
- Total revenue between $779 million and $781 million.
- Non-GAAP operating income between $104 million and $105 million.
- Non-GAAP net income per share between $0.40 and $0.41, assuming 276 million diluted weighted-average shares outstanding.

62.     The material decline in guidance was quickly noted by analysts, with J.P. Morgan

noting that the Company had "materially lowered its FY revenue and billings guidance, resetting

the growth glidepath to +6.5% vs. +10% prior[.]"

63.     Also on June 5, 2024, the Company held an earnings call for investors, during which

Defendant Thomas finally disclosed the full extent of Sprinklr's failed push towards Sprinklr

Service, as well as the lasting problems it had caused:

> This quarter, we made good progress with these leadership changes and operational improvements. ***However, these changes are significant and will take time to show measurable improvements. Furthermore, implementing these changes during what has become a more challenging macro environment has created more short-term volatility than we expected. In the first quarter, buying behavior was more measured, sales cycles were longer, and budget scrutiny on renewals increased as well. As a result, Q1 performance reflects lower net new bookings and increased customer churn. Based on the current outlook for the year, we are lowering our revenue guidance for FY '25, but are committed to diligently managing the business and maintaining our non-GAAP operating income guidance.*** Manish will provide more details in his remarks.

\* \* \*

Look, there are three things that are super clear to us. One is, as we said, the macro is we're experiencing a pronounced change. ***Second, our go-to-market motion and the transition to the level of maturity that we need to have for a business of this scale and size, we are not there and it's taking us longer.*** And I'm not going to go through all of it. I'm sure we can follow up in the actions. ***But with the kind of people that we have around us and inside the company, what [we] needed to do was fairly clear. And what we realized as we went late last year and looked at our own progress, needless to say, no one, including myself, was happy with the pace of progress.*** And what we decided to do was to upgrade and make significant upgrades to the leadership, starting at the very top, right? That's what the investors and the Board would love to see.

* * *

***I'll acknowledge that we're seeing increased pressure on the core, which is everything outside of CCaaS the way we see it. And what we're finding is more price compression.*** We're not seeing like a crazy amount of logo churn. We're not seeing, I'm sure there'll be a question, we're not seeing the competitive dynamics shift. What we're finding is CIOs and CMOs looking at their top spend and looking to find money. And we're a premium provider. We were able to command premium prices. ***And we're just getting squeezed. And that I see as the primary driver***. And a lot of these as, Arjun, I'm making more calls than you would ever expect someone like me to be doing to these customers. ***And I can tell you firsthand, a lot of it is our own execution***….

64.     Similarly, Defendant Sarin admitted that Sprinklr "***continue[d] to experience higher churn in [its] core product suites, driven by reduced marketing spend, elimination of programs, and seat reductions***," which he said would continue throughout the 2025 fiscal year.

65.     Significantly, Sprinklr also withdrew its claim that $1 billion subscription revenue would be a "floor" for the 2027 fiscal year, thereby conceding that the impact of its decision to divert resources towards Sprinklr Service would have long-lasting consequences for the Company.

66.     On this news, Sprinklr's stock price fell approximately 15%, from a closing price of $10.84 on June 5, 2024, to a closing price of $9.20 per share on June 6, 2024.

67.     In direct response to the impact of Defendants' failed decision to divert resources

from Core Suite to Sprinklr Service, the Company announced that Defendant Thomas would be demoted to Co-CEO rather than sole CEO.

## FALSE AND MISLEADING PROXY STATEMENTS ISSUED DURING THE RELEVANT PERIOD

68.     On May 5, 2023, the Company filed a proxy statement on Schedule 14A with the SEC (the "**2023 Proxy**"), which was solicited by Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty.

69.     The 2023 Proxy asked for the Company's shareholders to vote to, among other things: (1) re-elect Defendants Agrawal, Gillis, and Kanouff to the Board; (2) ratify the Company's selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 fiscal year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers, including Defendants Thomas and Sarin.

70.     With regard to the "Role of the Board of Directors in Risk Oversight," the 2023 Proxy stated, in relevant part:

> One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through various standing committees of the board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for our company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.

> While our full board of directors has overall responsibility for risk oversight, it has delegated oversight of certain risks to its committees. Our audit committee monitors our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is

undertaken. Furthermore, our audit committee oversees risks associated with information security, and regularly reviews with management our information security programs and assessment, management and mitigation of such risk. Further, our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate governance committee oversees our major corporate governance risks, including through monitoring the effectiveness of our corporate governance guidelines.

At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security and privacy risks, and financial, tax and audit-related risks. In addition, among other matters, management provides to our audit committee periodic reports on our compliance programs and investment policy and practices.

71.    The 2023 Proxy also contained the following statement about the Company's Code of Conduct:

Our board of directors has adopted the Sprinklr, Inc. Code of Conduct and Ethics that applies to all officers, directors and employees. The Code of Conduct and Ethics is available on our website at investors.sprinklr.com. If we make any substantive amendments to the Code of Conduct and Ethics or grant any waiver from a provision of the Code of Conduct and Ethics to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website rather than by filing a Current Report on Form 8-K.

72.    Ultimately, in addition to ratifying the selection of KPMG LLP and approving the compensation of the Company's named executive officers, Sprinklr's shareholders also voted to re-elect Defendants Agrawal, Gillis, and Kanouff, thereby allowing them to continue breaching their fiduciary duties to the Company.

73.    On May 3, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "**2024 Proxy**"), which was solicited by Defendants Pham, Agrawal, Gillis, Kanouff,

Schloss, Wasim, Thomas, and Haverty.

74.     The 2024 Proxy asked for the Company's shareholders to vote to, among other things: (1) re-elect Defendants Pham, Schloss, and Wasim to the Board; (2) ratify the Company's selection of KPMG LLP as the Company's independent registered public accounting firm for the 2025 fiscal year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers, including Defendants Thomas and Sarin.

75.     With regard to the "Role of the Board of Directors in Risk Oversight," the 2024 Proxy stated, in relevant part:

> One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through various standing committees of the board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for our company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.
>
> While our full board of directors has overall responsibility for risk oversight, it has delegated oversight of certain risks to its committees. Our audit committee monitors our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Furthermore, our audit committee oversees risks associated with information security, and regularly reviews with management our information security programs and assessment, management and mitigation of such risk. Further, our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate governance committee oversees our major corporate

governance risks, including through monitoring the effectiveness of our corporate governance guidelines.

At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security and privacy risks, and financial, tax and audit-related risks. In addition, among other matters, management provides to our audit committee periodic reports on our compliance programs and investment policy and practices.

76.    The 2024 Proxy also contained the following statement about the Company's Code of Conduct:

Our board of directors has adopted the Sprinklr, Inc. Code of Conduct and Ethics that applies to all officers, directors and employees. The Code of Conduct and Ethics is available on our website at investors.sprinklr.com. If we make any substantive amendments to the Code of Conduct and Ethics or grant any waiver from a provision of the Code of Conduct and Ethics to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website rather than by filing a Current Report on Form 8-K.

77.    Ultimately, in addition to ratifying the selection of KPMG LLP and approving the compensation of the Company's named executive officers, Sprinklr's shareholders also voted to re-elect Defendants Pham, Schloss, and Wasim, thereby allowing them to continue breaching their fiduciary duties to the Company.

78.    The 2023 Proxy and the 2024 Proxy (together, the "**Proxies**") failed to disclose that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business;

and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

79.     In addition, the Proxies were materially false and misleading because, despite statements to the contrary, the Individual Defendants failed to abide by the Company's own Code of Conduct by: (i) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (ii) failing to report violations of the Code of Conduct.

80.     The Proxies were also materially false and misleading because, despite statements to the contrary, the Board had not adequately performed its risk oversight functions.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.     Plaintiff brings this action derivatively, in the right and for the benefit of the Company, to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

77.     Sprinklr is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

78.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

79.     Plaintiff is an owner of Sprinklr stock and has been a continuous holder of the Company's common shares at all relevant times.

80.     At the time this action was commenced, the Company's 10-member Board was comprised of Defendants (i) Thomas; (ii) Agrawal; (iii) Gillis; (iv) Haverty; (v) Kanouff; (vi)

Schloss; and (vii) Wasim (together, the "**Director Defendants**"), as well as relevant non-parties (viii) Hauser; (ix) Reed; and (x) Ward (together with the Director Defendants, the "**Demand Board**"). Accordingly, Plaintiff is only required to show that five members of the Demand Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all seven of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Demand Board to institute this action is not necessary because such a demand would have been a futile act.

81.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

82.    The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

83.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Sprinklr, the Director Defendants knew, or should have known, the material facts surrounding the Company's decision to divert resources from Sprinklr's Core Suite to Sprinklr Service.

84.     Defendants Agrawal, Gillis, and Wasim serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Agrawal, Gillis, and Wasim cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

85.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Sprinklr stock and stock options they held.

86.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Sprinklr's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

87.     Furthermore, demand in this case is excused because each of the Director Defendants derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Director Defendants have taken remedial action to redress the conduct alleged herein. For instance, none of the Individual Defendants have sought to enforce Sprinklr's Incentive Compensation Recoupment Policy, which was adopted by the Compensation Committee effective as of October 2, 2023.

88.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent

and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

89.     The acts complained of herein constitute violations of fiduciary duties owed by Sprinklr's officers and directors, and these acts are incapable of ratification.

90.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Sprinklr. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Sprinklr, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

91.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Sprinklr to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

92.     Accordingly, for all of the reasons set forth above, none of the Director Defendants can consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Demand Board is futile and excused.

## COUNT I

**Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

96.     The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the Proxies filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the role of the Board in risk oversight.

97.     The Proxies were used to solicit shareholder votes in connection with the election of Defendants Agrawal, Gillis, Kanouff, Pham, Schloss, and Wasim to the Board. In addition, the Proxies were used to urger shareholders ratify the selection of KPMG LLP as the Company's independent public accounting firm and approve, on an advisory basis, the compensation of the Company's named executive officers including, *inter alia*, Defendants Thomas and Sarin. While the shareholder vote was non-binding, the Proxies indicated that "the views expressed by the stockholders…are important to management and our board of directors."

98.     Describing the Company's "executive compensation program," the Proxies indicated that compensation is intended to "reward executives' performance and contributions to our short- and long-term business results[.]"

99.     The materially false and misleading statements contained in the Proxies regarding the Company's customer base therefore misleadingly induced shareholders to vote in favor of the election of Defendants Agrawal, Gillis, Kanouff, Pham, Schloss, and Wasim Agrawal, Gillis, Kanouff, Pham, Schloss, and Wasim and performance-based compensation to Defendants Thomas and Sarin, to which they were not entitled.

100.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

**Against the Individual Defendants for Breach of Fiduciary Duties**

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

103.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

104.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting materially false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and

deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

106.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

109.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Sprinklr.

112.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Sprinklr that was tied to their performance or to the artificially inflated valuation of Sprinklr.

113.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

114.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

115.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial in this matter on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

Dated: April 30, 2025

**LEVI & KORSINSKY, LLP**

_/s/ Correy A. Suk_
Correy A. Suk
Gregory M. Nespole
Daniel Tepper
Sidharth Kakkar
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
csuk@zlk.com
gnespole@zlk.com
dtepper@zlk.com
skakkar@zlk.com

_Counsel for Plaintiff_

## <u>VERIFICATION</u>

I, Joel Newman, do hereby verify that I am a holder of common stock of Sprinklr, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   April 29 , 2025

_DocuSigned by:_
_Joel Newman_
1315DEBA5E2C4EC...

Joel Newman